385 F.2d 322
 Edward Raymond SPURR, Plaintiff-Appellee,
v.
LaSALLE CONSTRUCTION COMPANY, Defendant-Appellant.
Edward Raymond SPURR, Plaintiff-Cross-Appellant,
v.
ACME STEEL COMPANY, LaSalle Construction Company, and U.S.
Steel Corporation, Defendants-Cross-Appellees.
ACME STEEL COMPANY, Lasalle Construction Co., and U.S. Steel
Corporation, Third-Party, Plaintiffs-Appellees,
v.
S. J. REYNOLDS COMPANY, Inc., Third-Party, Defendant-Appellant.
 Nos. 15148-15150.
 United States Court of Appeals Seventh Circuit.
 Sept. 13, 1967, On Denial of Rehearing Nov. 8, 1967.
 
 Harold W. Huff, Herbert C. Loth, Jr., Richard J. Kissel, Gene A. Knorr, Chicago, Ill., for LaSalle Construction Co.
 Albert F. Manion, L. H. Vogel, Chicago, Ill., Bruce Parkhill, John H. Bishop, John M. Falasz, Chicago, Ill., for S. J. Reynolds Co.
 Harlan L. Hackbert, Chicago, Ill., Hackbert, Rooks, Pitts, Fullager & Poust, Chicago, Ill., of counsel, Jeremiah Marsh, Chicago, Ill., for appellee American Bridge Division.
 William J. McKenna, Barry L. Kroll, John C. Bartler, Chicago, Ill., of counsel, Jacobs & McKenna, Chicago, Ill., for third-party plaintiff-appellee Acme Steel Co.
 Philip H. Corboy, William Theodorous, William J. Harte, Chicago, Ill., for Edward Raymond Spurr.
 Before KILEY, FAIRCHILD, and CUMMINGS, Circuit Judges.
 FAIRCHILD, Circuit Judge.
 
 
 1
 Action for damages for personal injuries.[1] Plaintiff Edward Spurr was at work in the construction of a large steel plant in Illinois on April 24, 1959. He fell backwards into an open pit and was injured. He brought action against the owner of the plant, Acme Steel Company, and a number of contractors, including LaSalle Construction Company, and American Bridge Division of United States Steel Corporation. Acme and LaSalle filed third-party complaints against Spurr's employer, S. J. Reynolds Co., seeking indemnity.
 
 
 2
 In the principal action, the jury found in favor of Spurr and against LaSalle and American Bridge in the amount of $250,000, but exonerated Acme. The court, however, ordered judgment in favor of American Bridge, notwithstanding the verdict. The court also determined as a matter of law that Reynolds must reimburse LaSalle for payment of Spurr's judgment and must reimburse both LaSalle and Acme for expense incurred in defending against the claim of plaintiff. LaSalle, Spurr and Reynolds have appealed from portions of the judgments adverse to them.
 
 
 3
 1. Spurr's alleged contributory negligence. Spurr was a pipefitter. He and Olson, another Reynolds employee, were directed to dismantle a 'strainer' in an oxygen line. The strainer was mounted on the north side of a column, some five feet above the ground surface which lay north of the column and around it to the east and west. Immediately south of the column was the north edge of a very large open pit 13-14 feet deep. The concrete wall along the north side of the pit extended above the ground level sufficiently to be described as a curbing, but there was no other barricade.
 
 
 4
 Olson described Spurr's position shortly before he fell, but Olson was busy preparing a new fitting and was not observing Spurr at the moment he lost his balance. Spurr has no memory of the event. A witness who did testify that he saw Spurr fall, and described Spurr in a position and maneuver which virtually invited disaster, was thoroughly impeached, and the jury could properly have rejected his testimony. There were no other eye witnesses.
 
 
 5
 The testimony most favorable to Spurr, and the inferences which might reasonably be drawn would support the following view of the occurrence: Spurr's co-worker, Olson, was standing north of the column and strainer. Spurr was standing west of the column facing north, pulling southward on a 24-inch wrench. He was 12 to 18 inches from the edge of the pit. His wrench slipped; he lost his balance and fell backwards into the pit. Had a barricade been present it would probably have helped him regain his balance sufficiently to avoid the fall.
 
 
 6
 LaSalle contends that Spurr was guilty of contributory negligence as a matter of law, principally because he chose to work with his back to the open pit and to pull his wrench toward the pit. LaSalle points to the testimony of Tompkins, another Reynolds pipefitter, that one man could do the job by standing north of the column, facing south. He would pull two wrenches toward him, rotating one pipe or fitting clockwise by pulling the wrench in his right hand, and the other counter-clockwise by the wrench in his lift. He did suggest it could properly be done by standing to the west, although his description at that point was not clear. One could not stand to the east because of an obstruction on that side. Spurr was using only one wrench and was attempting to produce a counter-clockwise rotation by pulling southerly. Olson was occupying the position to the north where he could have produced an opposing clockwise rotation with the second wrench if that became necessary.
 
 
 7
 Events proved, of course, that danger lurked in Spurr's position. But in our view, the jury could properly find that Spurr did not make an unreasonably dangerous choice among the possible methods of performing his work.
 
 
 8
 2. LaSalle's negligence. The project was a large one. It had been under way for a year before the accident. There were about 50 subcontractors and about 1,000 workers. LaSalle had a contract with Acme by which LaSalle undertook to complete, either by itself or through subcontractors, all construction work assigned to it. Acme reserved the right to make direct contracts with others, and did so. Reynolds, Spurr's employer, was a subcontractor of LaSalle. American Bridge had a direct contract with Acme.
 
 
 9
 LaSalle contends it had no responsibility to do more than it did with respect to barricading the pit.
 
 
 10
 The plans called for a chain-barrier around the pit as part of the finished structure. Sleeves were to be imbedded in the top of the pit wall, and pipes were to be placed in the sleeves. A chain would run from pipe to pipe. The chainbarrier could be removed when operations in the plant required. LaSalle had built the pit wall and installed the sleeves. There was considerable contention whether the installation of the chain-barrier was the contractual responsibility of LaSalle or American Bridge. There was testimony, indeed, that the chain-barrier had been installed by American Bridge long before the accident. It was not in place at the time of the accident, and if the pipes and chain been there and then removed, no one claimed to know where they were.
 
 
 11
 But we think the verdict can be sustained against LaSalle on the proposition that it was the general contractor and that ordinary care required the barricading of the pit for the protection of persons lawfully on the premises.[2] This responsibility is quite apart from the contractual responsibility for the installation of a chain-barrier as part of the finished structure.
 
 
 12
 There was an issue at the trial whether Acme or LaSalle exercised the type of control over the project which would impose responsibility for maintenance of reasonably safe conditions. The court instructed the jury that they were to determine whether LaSalle exercised general control and superintendence, and that if so it owed a duty to employees of a subcontractor to provide a reasonably safe place to work.
 
 
 13
 Under the contract between LaSalle and Acme, Acme did reserve the right to contract with others for part of the work. Yet LaSalle undertook to coordinate all work directly contracted for with the work it agreed to perform or subcontract. Although there was evidence of considerable activity by representatives of Acme at the construction site, the jury was satisfied that Acme did not exercise general control of the work. We think the evidence supports the finding that LaSalle had such control and the resulting responsibility for maintenance of a reasonably safe place to work.
 
 
 14
 There was evidence that it is the custom of LaSalle and building contractors generally to barricade pits in order to protect construction workers. The jury could find that LaSalle was negligent in failing to construct and maintain a barricade at the pit.
 
 
 15
 LaSalle contends that the absence of a barricade could not be deemed a proximate cause of Spurr's fall. It is true that the existence of the pit was obvious and that the additional warning which a barricade would have supplied would not have changed the situation. As previously stated, however, the jury could reasonably have believed that a barricade would have helped Spurr regain his balance sufficiently to avoid the fall.
 
 
 16
 3. Alleged Negligence of American Bridge. Plaintiff argues that the evidence presented a jury question whether American Bridge was negligent, and that he is entitled to judgment against American Bridge, on the verdict. The theory is that American Bridge had agreed to erect the chain-barrier which was to be part of the finished construction. To succeed, plaintiff had to prove that erection of the chain-barrier was part of the work American Bridge agreed to do and that performance of this part of the contract was due before the accident.
 
 
 17
 In our opinion the evidence does not support those propositions.
 
 
 18
 The only reference to the chainbarrier in any document pertaining to the construction indicates that LaSalle was to install it. Plaintiff has not pointed to any provision which is even open to the construction that American Bridge was to erect this barrier. He relies on testimony by an officer of LaSalle that 'the steel that went above the foundations was the responsibility, as I understand it, of American Bridge.' A motion was made to strike this conclusion, but only partially granted. The record shows no foundation for the statement and it is not competent evidence that American Bridge had agreed to erect the chainbarrier. The other testimony relied on was to the effect that the superintendent of American Bridge said immediately after the accident that the engineers hadn't let him put guard rails up, but perhaps now they would. This testimony is dubious at best because of persuasive evidence that the superintendent was not at work that day, but even if the statement was made, the engineers referred to could as well have been representatives of LaSalle, which had authority to coordinate all parts of the work, as of American Bridge. There was, moreover, evidence that guard rails were put up after the accident, but not by American Bridge.
 
 
 19
 4. Claimed prejudicial errors. LaSalle argues that it is entitled to a new trial. We find no merit in any of the claims. They are as follows:
 
 
 20
 a. There was testimony that a chain-barrier or guard rail was erected soon after the accident. We agree that such testimony is inadmissible for the purpose of proving that failure to have a guard rail was negligence.[3] But under the circumstances of this case, it was admissible for other reasons.
 
 
 21
 An officer of LaSalle testified that the chain-barrier had been installed before the accident. Apparently LaSalle wanted the jury to find that all duty to safeguard had thus been performed, even though the chain-barrier was out of place at the time of the accident. Testimony that it was installed after the accident tended to refute the claim that it had been installed before.
 
 
 22
 There was also an issue whether it was the duty of LaSalle or American Bridge to install the chain-barrier provided for in the plans, and proof that one of them did it would have some probative value on that issue. Nobody seemed to know whose men installed the barrier after the accident, but they wore green hard hats. This seemed to exclude American Bridge, whose men wore brown hats, and was at least consistent with LaSalle's having done it.
 
 
 23
 b. LaSalle concedes that there was competent, relevant testimony that it is a custom in the construction industry to barricade pits and holes to keep men from walking into them. It objected, however, to the reading of excerpts from several trade codes and manuals, calling for guarding of floor openings and excavations. LaSalle's point seems to be that as a matter of law the ground surface around the pit was not a floor, and the pit not a floor opening or excavation.
 
 
 24
 There was testimony, however, that these manuals were recognized in the industry and that this pit woud be considered a floor opening. The contrary is not so clear as a matter of law as to render these manuals irrelevant.
 
 
 25
 c. LaSalle claims it was error not to strike the answer to a hypothetical question. Dr. DuSold had known Spurr before the accident as his family physician. He had seen him afterward, although he did not treat him for these injuries. The doctor testified that Spurr's 'responses were very hesitant, almost a regressed behavior.' The examination by plaintiff's counsel, Mr. Corboy, continued as follows:
 
 
 26
 'Q. Assume for the moment that the man had received a skull fracture on April 24, 1959, resulting in unconsciousness and a comatose condition subsequent to the injury, causing the skull fracture. Do you have an opinion based upon a reasonable degree of medical and surgical certainty as to whether that type of an injury could be responsible for this regressive behavior that you noticed on July 31, 1959?
 
 
 27
 'A. Yes, sir.
 
 
 28
 'Q. What is your opinion?
 
 
 29
 'A. It is my opinion that the accident, as described to me and the medical history could well account for the picture I saw.
 
 
 30
 'Q. All right, sir.
 
 
 31
 Mr. Huff: I will move to strike that, that was not responsive to the question that was asked him. It included elements not included in the question.
 
 
 32
 'The Court: If counsel wishes to adopt it--
 
 
 33
 'Mr. Corboy: I will adopt it.
 
 
 34
 'The Court: Objection overruled.'
 
 
 35
 The court was satisfied when examining counsel adopted the volunteered qualification of the answer. The court did not deal with the proposition that neither the questions put to Dr. DuSold nor any of his answers describe the accident or medical history as revealed to him. It would probably have been better practice for the court to have struck the answer and imposed on plaintiff's counsel the burden of clarifying the record. As it was it was left to Mr. Huff, counsel for LaSalle, to do it on cross-examination. He chose not to do so.
 
 
 36
 The error, if any, was not prejudicial. There was little question about the nature of the fall or the medical history, and it is highly improbable that Dr. DuSold's opinion was based upon any fact which did not appear in the record, or about which there was any dispute.
 
 
 37
 d. LaSalle argues there was no evidence to support an award for medical expenses, and that the court should not have instructed the jury on this element of damages.
 
 
 38
 It is true that plaintiff did not produce evidence in traditional form showing that he, or others, in his behalf, had paid or incurred bills for services of physicians and nurses, hospital care, medicines and the like, that these items were necessary by reason of his injuries, and that the amounts were reasonable. He did call a claim supervisor of his employer's compensation insurer, who testified the insurer had paid $5,692.20 in medical expenses. The insurer's file, showing individual payments, was in court and marked as an exhibit, but no counsel asked for the detailed figures. Although the testimony may have been offered primarily to show that the insurer had a lien on any recovery, the testimony came in without limitation.
 
 
 39
 LaSalle could have inquired about any item, but did not. Common sense tells us it is most improbable that the insurer paid any medical expenses which could not have been shown to be reasonable in amount and necessary by reason of the injury. Actual payment of medical expense is prima facie evidence of reasonableness.[4] No claim is made that such damages cannot be awarded to Spurr because the expenses were paid by another. Any error or irregularity with respect to this element of damages was not prejudicial.
 
 
 40
 e. LaSalle asserts that the amount awarded ($250,000) is excessive.
 
 
 41
 Spurr was 49 years old at the time of his accident, 54 at the time of trial. He demonstrated an earning capacity of approximately $10,000 per year. At age 54, he had a life expectancy of 20 years. There was medical testimony that he was permanently and totally disabled from gainful employment. Spurr testified that his activity consists of care of his yard and walking to a store where he visits with people.
 
 
 42
 His skull was fractured and there was bruising of the brain. He was unconscious for several weeks, and continued to have dizziness at the time of the trial. As a result of injuries to cranial nerves, his eyes are crossed and he has double vision. He cannot turn his right eye outward.
 
 
 43
 He lost weight; an observable change in personality occurred. He has retrograde and anterograde amnisia. His right knee cap was fractured, and was removed. Various painful effects remain in that area. He suffers numbness in his right arm and hand. The jury and trial judge had the benefit of seeing the plaintiff in court.
 
 
 44
 The award seems high. Doubtless other people with similar injuries have been awarded less. But considering the evidence in the light most favorable to plaintiff, the award is within the range of reasonably debatable amounts.
 
 
 45
 5. Contract of indemnity. Count I of the Acme and LaSalle third-party complaints against Reynolds asserted that Reynolds had obligated itself by Article XIII of its subcontract with LaSalle to indemnify them from liability to Spurr and the expenses of their defense. The district court so decided as a matter of law.
 
 Article XIII provided as follows:
 
 46
 'The Sub-Contractor shall indemnify and save harmless the Owner, the Engineer, the Contractor and their respective agents from any and all liability, payments and expenses of any nature for injury or death to any person, or persons, or for damage to any property, caused or alleged to have been caused by the Sub-Contractor, or incidental to the execution of work under this contract by the Sub-Contractor, his agents or his employees; and the Sub-Contractor shall maintain from the beginning until the completion of this contract policies of insurance satisfactory to the Contractor, covering the liabilities above mentioned, such as Workmen's Compensation Insurance, covering liability according to the requirements of the State, Public Liability Insurance and Contingent Insurance in limits satisfactory to the Contractor. (The Sub-Contractor furthermore agrees that, before commencing work, he shall furnish to the Contractor satisfactory evidence that he has complied with all of the stipulations of this Article.)'
 
 
 47
 In Article XIII Reynolds promised to indemnify Acme and LaSalle from all liability of described types and to maintain insurance 'covering the liabilities above mentioned.' It was neither alleged nor determined, under Count I, that Reynolds failed to use ordinary care to protect Spurr. The question debated under this count is essentially whether the liabilities referred to in Article XIII include liability of Acme or LaSalle arising out of their own negligence but without negligence on the part of Reynolds.
 
 
 48
 The parties assume that the words 'injury * * * caused or alleged to have been caused by the Sub-Contractor' mena injury caused or alleged to have been caused by the wrongful or negligent acts or omissions of Reynolds. Reynolds apparently concedes that if LaSalle's liability arose from the joint or concurrent negligence of Reynolds or its subcontractors and LaSalle, Reynolds would be required to indemnify LaSalle.
 
 
 49
 Concededly, the words 'injury * * * incidental to the execution of work under this contract by the Sub-Contractor, his agents or his employees' must mean something not covered by the language pertaining to injury caused by Reynolds. Reynolds suggests that they refer to liability of Reynolds for workmen's compensation, which might, under certain circumstances, constitute liability of Acme or LaSalle, and should not be given broader meaning. On the other hand, it seems clear that these words need not be so limited and can reasonably include any sort of liability of LaSalle or Acme for injury incidental to the execution of the work. A natural reading of the words include injury occurring under the circumstances presented here.
 
 
 50
 Reynolds relies upon a statement by the Supreme Court of Illinois in Westinghouse Electric Elevator Co. v. LaSalle Monroe Building Corp.:[5] 'It is quite generally held that an indemnity contract will not be construed as indemnifying one against his own negligence, unless such a construction is required by clear and explicit language of the contract * * * or such intention is expressed in unequivocal terms.' Reynolds appears to argue that general language, such as appears in Article XIII, is therefore, in Illinois, insufficient as a matter of law, to create an obligation to indemnify another against liability arising out of the other's own negligence. The argument suggests that a specific reference to liability arising out of the indemnitee's negligence is required. General inclusive language, has, however, been held sufficiently explicit in decisions of Illinois appellate courts[6] and of this court, applying Illinois law.[7] Reynolds' suggested limitation of the words in question to liability for workmen's compensation seems to us a strained construction, and we agree with the conclusion reached by the district court.
 
 
 51
 Reynolds further argues that even if its promise to indemnify properly includes the consequences of Acme's or LaSalle's own negligence, it is only a promise to indemnify against loss, and neither Acme nor LaSalle has sustained or will sustain any loss, because each is adequately insured against the pertinent liability.
 
 
 52
 The promise was not simply 'to indemnify' nor to 'indemnify against loss.' The promise was to 'indemnify and save harmless * * * from any and all liability, payments and expenses of any nature. * * *' It appears to be the more widely accepted rule that where there is a promise to indemnify against liability (not merely against loss or damage), the obligation of the indemnitor to pay arises when the liability of the indemnitee is established and the indemnitee need not prove that he has made payment.[8]
 
 
 53
 In the only Illinois case which Reynolds contends holds otherwise, the text of the promise is not quoted and the court described it as a promise to pay losses.[9]
 
 
 54
 In any event, the judgment here does not require Reynolds to pay LaSalle the amount of Spurr's judgment until LaSalle or its insurer has made payment to Spurr. A recent Illinois appellate court decision holds that the insurer of an indemnitee who has paid the indemnitee's liability and who was subrogated to the rights of the indemnitee may recover from the indemnitor.[10] This is consistent with the proposition that the fact that the indemnitee's liability was covered by insurance does not negate the indemnitor's obligation.[11]
 
 
 55
 We also deem it clear that the promise to indemnify from any and all expenses of any nature includes the expense incurred by the indemnitees in defending themselves against Spurr's claim.
 
 
 56
 Reynolds offered proof in support of a claim that LaSalle had become estopped from claiming indemnity from liability arising from its own negligence, in the absence of concurring negligence of Reynolds. The gist of the claim is that although Reynolds had insured itself against liability for its own negligence, and against contractual liability to indemnify LaSalle, the latter coverage was limited to liability arising from the negligence of Reynolds or its subcontractors, or joint or concurrent negligence of Reynolds or its subcontractors and LaSalle or Acme. Thus Reynolds had, in effecting insurance, construed Article XIII as it now does, and Reynolds contends that in accepting proof of such insurance, LaSalle had estopped itself from construing Article XIII as it now does.[12]
 
 
 57
 Estoppel was asserted at a late stage, and the district court declined to pass on it. Although the offer of proof did establish the limitation on coverage of Reynolds' contractual liability, it did not show that LaSalle was chargeable with notice of the limitation. A certificate of insurance, delivered to LaSalle, showed coverage of 'contractual' liability, but did not indicate the limitation to liability for injury where Reynolds' negligence was at least a concurring cause.
 
 
 58
 If Reynolds should be unable, between it and its insurer, to establish its own negligence as contributing to Spurr's injury, Reynolds, who is not in the business of indemnifying others, will bear the burden rather than its own insurer or the insurers of LaSalle (and Acme) who are in that business. But this unpalatable result provides no sound reason for an unnatural construction of the contract.
 
 
 59
 6. Because Reynolds is liable for indemnity pursuant to its contract, there is no occasion to decide whether the district court properly decided as a matter of law that there was no common law liability for indemnification.
 
 
 60
 The judgments are affirmed.
 
 
 61
 On petition for rehearing.
 
 
 62
 PER CURIAM.
 
 
 63
 LaSalle's third-party complaint against Reynolds contained two counts. In Count I LaSalle asserted Reynolds' liability to indemnify LaSalle, arising out of the contract discussed in part numbered 5 of our opinion. The district court found there was such liability, pursuant to express contract, and gave judgment accordingly February 1, 1965. Reynolds appealed, and we affirmed.
 
 
 64
 LaSalle had appealed from orders of June 19, 1964 directing a verdict in favor of Reynolds on Count II of the thirdparty complaint, and of October 27, denying reconsideration. In Count II, LaSalle had alleged that any negligence causing Spurr's injuries proximately resulted from active negligence of Reynolds; that any liability imposed on LaSalle would be vicarious, its relevant acts being purely passive in nature.
 
 
 65
 We assumed that review of the court's ruling on Count II would be necessary only if we disagreed with the district court on the issue of contractual indemnity. Common law liability for indemnity might exist and support a judgment for indemnity even if contract liability did not, but having upheld the district court on contractual liability, we said there was no occasion to consider the common law theory.
 
 
 66
 LaSalle now asks us to decide the Count II issue, and Reynolds joins in this request. Our decision on this point still can make no difference in the judgments rendered and affirmed. These parties, however, say they are not only concerned with the judgment, but with the question whether there may have been common law liability as well as liability upon contract. Apparently the importance of the matter to these parties arises from some provision of Reynolds' insurance policy, not of record.
 
 
 67
 Although consideration of the issue is not necessary, it is not improper. We have no hesitancy in stating our conclusion that the record would not support a finding of common law liability for indemnity.
 
 
 68
 LaSalle's theory is that Reynolds had actual knowledge of Spurr's performing work near the pit while LaSalle did not; that Reynolds failed to requires Spurr to use a safety belt, to instruct Spurr to remove the strainer in a safer way, to warn Spurr against working in a dangerous position, and to put up a temporary barricade while Spurr was working in a dangerous position, and to put up a temporary barricade while Spurr was working near the pit; that by comparison of these delinquencies with LaSalle's failure to barricade the pit for the general benefit, Reynolds was the 'active and primary wrongdoer' and LaSalle 'bears a passive or secondary relationship to the cause of the injury.'[13]
 
 
 69
 We do not interpret the ruling of the district judge as absolving Reynolds from the negligence alleged in Count II, or, indeed, as deciding that Reynolds was or was not negligent, but as deciding that it was inappropriate to submit to the jury and issue under Count II, i.e., assuming that the jury found LaSalle negligent in failing to erect a barricade, and found Reynolds negligent in the respects claimed by LaSalle, such negligence did not differ sufficiently as to character, degree, or relationship to the injury to warrant classifying LaSalle's as passive and secondary and Reynolds' as active and primary.
 
 
 70
 We agree.
 
 
 
 [1]
 Jurisdiction is based on diversity. Illinois law controls
 
 
 [2]
 See Leatherman v. Schueler Bros., Inc. (1963), 40 Ill.App.2d 56, 189 N.E.2d 10, 12; Johnson v. Central Tile & Terrazzo Co. (1965), 59 Ill.App.2d 262, 207 N.E.2d 160
 
 
 [3]
 Garshon v. Aaron (1947), 330 Ill.App. 540, 71 N.E.2d 799; Day v. Barber-Colman Co. (1956), 10 Ill.App.2d 494, 135 N.E.2d 231; Anno. 64 A.L.R.2d 1296
 
 
 [4]
 Wicks v. Cuneo-Henneberry Co. (1926), 319 Ill. 344, 150 N.E. 276; Williams v. Matlin (1946), 328 Ill.App. 645, 66 N.E.2d 719
 
 
 [5]
 (1946), 395 Ill. 429, 70 N.E.2d 604, 607
 
 
 [6]
 Gay v. S. N. Nielsen Co. (1958), 18 Ill.App.2d 368, 152 N.E.2d 468, and De Tienne v. S. N. Nielsen Co. (1963), 45 Ill.App.2d 231, 195 N.E.2d 240
 
 
 [7]
 Bentley v. Palmer House Co. (7th Cir. 1964), 332 F.2d 107, 110
 
 
 [8]
 42 C.J.S. Indemnity 14(b), p. 588; 13(a), p. 584
 
 
 [9]
 Daugherty v. Alliance Cas. Co. (1933), 271 Ill.App. 71, 73
 
 
 [10]
 Shell Oil Co. v. Hercules Construction Co. (1966), 74 Ill.App.2d 166, 219 N.E.2d 392
 
 
 [11]
 42 C.J.S. Indemnity 31, p. 613
 
 
 [12]
 A close analysis of Articles XIII would suggest that since the liability referred to both in the promise to indemnify and the promise to insure was the liability of LaSalle or Acme, Reynolds had obligated itself to maintain policies in which LaSalle and Acme were insured, but the form of insurance chosen, insuring Reynolds from liability (including 'contractual' liability), seems to have been satisfactory
 
 
 [13]
 See Rovekamp v. Central Const. Co. (1964), 45 Ill.App.2d 441, 195 N.E.2d 756, 759