FORD MOTOR COMPANY, a corporation, and Insurance Company of North America, as partial subrogee, Plaintiffs,

v.

COMMISSARY, INCORPORATED, a corporation, and Zurich Insurance Company, a corporation, Defendants.

No. 67 C 929.

United States District Court
N. D. Illinois, E. D.

April 5, 1968.

L. H. Vogel, Chicago, Ill., for plaintiffs.

Hubbard, Hubbard, O'Brien & Hall, Chicago, Ill., for defendants.

## MEMORANDUM OPINION

DECKER, District Judge.

This is an action founded on diversity of citizenship in which Ford Motor Company, a Delaware corporation, and Insurance Company of North America (I. N.A.), a Pennsylvania corporation, seek recovery of $39,356.65 plus interest, costs, expenses, and attorneys' fees from Commissary, Incorporated, an Illinois corporation, and Zurich Insurance Company, a Swiss corporation. The cause has been submitted for determination on stipulated facts, which may be stated as follows.

For seven years beginning in 1958 Commissary operated a cafeteria in the Ford Motor Company plant located at 12600 Torrence Avenue, Chicago, Illinois. This was done pursuant to a written agreement entered into between these parties on September 24, 1958. On May 11, 1963, Mae Hurd, an employee of Commissary, injured her back when she slipped on a wet floor in the cafeteria kitchen, where she was working. The water on the floor resulted from a leak in a soup kettle which was installed by Ford. Ford employees had been informed of the leak during the week preceding May 11, 1963, but they had not repaired it as requested.

On May 11, 1964 Mae Hurd filed a complaint against Ford in this Court (No. 64 C 787), charging Ford with negligence and seeking damages for personal injuries resulting from the fall in the kitchen. At the time of the accident Ford was insured for liability by I.N.A., and Commissary was insured by Zurich. Ford and I.N.A. retained the services of the law firm of Baker, McKenzie and Hightower to defend the suit. On March 12, 1965, however, I.N.A. made formal demand upon Commissary to take over further defense of the suit against Ford. The demand was made pursuant to Paragraph 3 of the agreement of September 24, 1958; that paragraph was a provision for Commissary to defend, indemnify, and hold Ford harmless for losses arising out of the operation of the cafeteria. Commissary and its insurer, Zurich, agreed to take over the defense, and I.N.A. agreed to allow the Baker, McKenzie and Hightower firm to continue to conduct the defense with Commissary and Zurich as the parties controlling the defense and paying the costs of it.

Investigation of the case and settlement negotiations were undertaken under these arrangements, and beginning on November 1, 1966 the case was carried day to day on the trial call. On November 3 letters were sent by Commissary and Zurich to both Ford and I.N. A., informing them that Commissary and Zurich had "recently" received information indicating that the injury to Hurd was the result of Ford's negligence and its breach of the agreement for operation of the cafeteria. Accordingly, they declared that they would not be liable for any further costs, expenses, attorneys' fees, judgments, or settlement amounts related to the Hurd lawsuit. On November 4 counsel who had been handling the defense of Ford requested, but was denied, leave of court to withdraw its appearance for Ford.

The Hurd case was tried beginning on November 14, 1966, and a jury verdict against Ford in the amount of $37,500 was rendered on November 23, 1966. Ford was thus found guilty of negligence in the ownership of and failure to repair the equipment on the cafeteria premises which caused the injury.

The verdict was satisfied on April 25, 1967 in the amount of $39,356.65, which included the judgment amount plus $744.87 interest and costs of $1,111.78. Under its contract of insurance with Ford, I.N.A. was obligated to pay and

did pay that portion of the judgment exceeding $25,000.00; Ford itself paid $25,000.00. Pursuant to an agreement between Hurd and Zurich, $10,924.07 was paid by Hurd to Zurich; this reimbursed the amount which Zurich had paid to Hurd as compensation and medical expense under the Illinois workmen's compensation laws, minus a percentage fee to Hurd's attorney and a percentage allowance on costs. The Baker, McKenzie and Hightower firm was paid $4,950 in fees, and $118.77 for reimbursement of expenses, by Zurich; it also received from I.N.A. $4,710.00 in fees and $1,532.10 for reimbursement of expenses.

The present complaint is in two counts. Count I asserts that defendants are obligated by the terms of the indemnity provision in the contract to reimburse Ford for the judgment it paid to Hurd. Count II claims that even if there was not a contractual obligation to indemnify, defendants became estopped to deny such an obligation when they undertook the defense of the Hurd lawsuit for an extended period of time and then withdrew shortly before the trial.

*Count I*

The contractual indemnity provision which is involved in Count I is Paragraph 3 of the agreement and reads as follows:

"[Commissary] agrees that it will indemnify, defend and hold Ford harmless against any and all loss, damage and expense, or claims therefor, for injury to or illness caused any person or damage, loss or expense to property arising out of the operation of said cafeteria (excepting property damaged by fire or unavoidable casualty), and for any loss, injury or illness resulting from the courtesy first aid treatment furnished employees of [Commissary], and for any loss or penalty resulting from [Commissary's] violation of any law or ordinance."

Plaintiffs' interpretation of this provision is that "operation" of the cafeteria must be taken in its broadest possible sense, meaning any function related in any way to the business and maintenance of the cafeteria, regardless of whether Ford or Commissary had the duty of performing the function. Defendants' view of Paragraph 3 is narrower and, I believe, sounder. It suggests that "operation" must be distinguished from activities such as the equipment maintenance and repair functions assigned to Ford by Paragraph 1(d). A close examination of the contract supports this interpretation.

Paragraph 1(c) requires Ford to furnish all equipment necessary "for the efficient operation of the cafeteria." Apparently the furnishing of equipment is a prerequisite to the operation of the cafeteria and is not considered as part of it. Paragraph 1(d) imposes upon Ford the duty to:

"keep said mechanical cafeteria equipment [including kitchen equipment such as soup kettles] in good mechanical condition and furnish at its expense all replacements and repair parts therefor * * *."

Also as part of the duties assumed by Ford in Paragraph 1, Ford agreed in Paragraph 1(e) to furnish "courtesy first-aid treatment" to the employees of Commissary while engaged in the operation of the cafeteria.

Paragraph 2 of the agreement details the obligations assumed by Commissary. Paragraph 2(a) states that Commissary shall "manage and operate said cafeteria in the space allotted to it." Paragraph 2(d) requires Commissary to "operate and maintain the cafeteria (including sweeping and mopping of the kitchen and storeroom) in accordance with all laws, ordinances [etc.] of federal, state and local authority * * *."

Ford thus agreed to furnish the equipment for "operation" of the cafeteria, keep it in good mechanical condition and furnish repair parts, while Commissary agreed to "operate" the cafeteria. Taking these portions of Paragraphs 1 and 2 together, it is clear that "operation" of the cafeteria was not

meant to include the maintenance and repair functions assumed by Ford in Paragraph 1(d). Considering the indemnity provision, Paragraph 3, I find no reason to assume or conclude that the term "operation" there had a meaning any broader than it had in Paragraphs 1 and 2. Thus I conclude that Paragraph 3 meant only that Commissary agreed to indemnify Ford for any losses Ford might suffer as a result of the manner in which Commissary performed, or failed to perform, the duties imposed upon it in Paragraph 2. "Operation" of the cafeteria did not mean that Commissary would indemnify Ford for Ford's own failure to perform the duties imposed upon it in Paragraph 1, whether that failure was negligent or not.

The restricted significance of "operation" in Paragraph 3 is made even clearer by the fact that Paragraph 3 does provide for indemnity for losses resulting from *one* of the functions which Ford itself assumed. That function is the "courtesy first aid treatment" which Ford agreed to provide in Paragraph 1(e). If, as defendants argue, "operation" refers even to functions assumed by Ford in relation to the cafeteria, this reference to Paragraph 1(e) would be superfluous. It is much more reasonable to interpret Paragraph 3 as a declaration solely that Commissary would indemnify Ford for losses resulting from Commissary's failure to perform its own obligations and for losses resulting from the first aid treatment Ford agreed to furnish. Nothing more than this was intended to be covered by Paragraph 3, and it cannot be given broader significance by this court now.

■ When all of the provisions of the contract are thus considered, I find no ambiguity as to the intention of the parties to give the word "operation" the restrictive meaning which I have indicated. However, if there were some ambiguity, then it is clear that I would be required under Illinois law to give preference to an interpretation which would deny indemnification to the party in the agreement whose negligence caused the accident, as opposed to an innocent party.

■ This rule is clearly set forth in Halperin v. Darling & Co., 80 Ill.App.2d 353, 225 N.E.2d 92 (1967). This case involved a truck leasing agreement in which the lessee agreed to indemnify the lessor for any loss or liability arising out of the "operation" of the trucks. In reversing a trial court ruling which implied that the lessor could be indemnified even for its own negligence in the *maintenance* of the trucks, the appellate court stated,

"Contracts of indemnity against one's own negligence are generally regarded as valid and enforceable. However, the unusual nature of such a contract requires that the agreement be strictly construed against the indemnitee. As stated in Westinghouse Electric Elevator Co. v. LaSalle Monroe Building Corp., 395 Ill. 429, at page 433, 70 N.E.2d 604, at page 607: 'It is quite generally held that an indemnity contract will not be construed as indemnifying one against his own negligence, unless such a construction is required by clear and explicit language of the contract, * * * or such intention is expressed in unequivocal terms.'

\*     \*     \*     \*     \*     \*

"It would be an extraordinary result to hold that [the lessee] should be held responsible for damages arising out of that over which he has lost control by way of the contract, without an express provision therein to that effect or a clear intention that such is what the parties intended." Id. at 356–358, 225 N.E.2d at 93–94.

The cases cited by plaintiff, such as Bentley v. Palmer House Co., 332 F.2d 107 (7th Cir.1964), and Spurr v. LaSalle Construction Co., 385 F.2d 322 (7th Cir.1967), do not disavow the rule that indemnity language must be clear and explicit in order to provide for indemnity against a party's own negligence. They go no farther than to state that in the particular situations there involved, general language of indemnity suffi-

ciently disclosed the intention of the parties to provide for indemnity even for the indemnitee's negligence. In those cases "a specific reference to liability arising out of the indemnitee's negligence" would not be required. 385 F.2d at 330. Furthermore, it may be noted that neither of those cases presented the type of mutual, continuing, inter-related undertakings which are involved here. Thus even if Paragraph 3 is said to be ambiguous, it is insufficient to permit indemnification of plaintiffs for Ford's own negligence. Judgment on Count I must be for defendants.

*Count II*

In Count II of the complaint plaintiffs allege that by assuming and conducting the defense of Ford up to the eve of trial, defendants either became estopped to disclaim the obligation to indemnify Ford or waived their right to disclaim such an obligation. A careful examination of the case law in Illinois and other jurisdictions convinces me that plaintiffs are entitled to recover under this count.

The issue presented by Count II is essentially this: Accepting that there was no contract obligation on Commissary or Zurich to indemnify Ford for any recovery by Hurd against it, did Zurich and Commissary waive the absence of an indemnity obligation, or become estopped to assert this absence, when they assumed the defense of Ford and carried it forward for nineteen months up to eleven days before trial? The general rule in insurance company estoppel cases in Illinois has been stated in various ways:

"The general rule of estoppel in insurance cases is that an insurer, who assumes the defense of its insured, is later estopped from denying coverage or from raising any policy defense to the loss resulting from an adverse judgment. [Citations omitted.] This, of course, is a general rule and is subject to exceptions and limita-

tions." Bourne v. Seal, 53 Ill.App.2d 155, 166, 203 N.E.2d 12, 18 (1964).

"It seems settled in Illinois that an insurance company waives its defense by continuing under the policy when it 'knows or in the course of ordinary events should have known' the facts in question and further that the company was bound to have known, if in the exercise of ordinary diligence it could have known. These conclusions, we think, are amply supported by Illinois authorities. Columbian Three Color Co. v. Aetna Life Ins. Co., 183 Ill.App. 384, 389. [Other citations omitted.]" Norwich Union Indemnity Co. v. Haas, 179 F.2d 827, 832 (7th Cir. 1950).

"This situation has frequently arisen where the insurance company undertakes the defense of a suit in situations where a policy defense exists. The question then arises as to whether or not such affirmative action as defending a suit constitutes a waiver of the right of the company to assert such defense or estops it from later asserting that defense. The rule seems to be that if the insurer had no knowledge of the existence of such a policy defense, or if the breach occurred after assumption of the defense, there is no waiver or estoppel. But, if the insurance company has actual knowledge or facts which would put it upon constructive notice of the existence of a policy defense, then the undertaking of such a defense would raise a waiver or estoppel." Appleman, "Insurance Problems in Automobile Negligence Cases," 1953 Ill.L.F. 231, 242.

"[A] liability insurer which assumes and conducts the defense of an action brought against the insured with knowledge of facts taking the accident or injury outside the coverage of the policy, and without disclaiming liability or giving notice of a reservation of its right to deny coverage, is thereafter precluded in an action upon the policy from setting up the defense of

noncoverage." Annot., 38 A.L.R.2d 1148, 1151 (1954).

The estoppel rule was applied in Lincoln Park Arms Building Corp. v. United States Fidelity & Guaranty Co., 287 Ill.App. 520, 5 N.E.2d 773 (1936), against an insurance company which had defended its insured through trial resulting in an adverse judgment and had then denied liability on the policy. The court stated that the insured "had the right to make its own defense of the * * * suit if the insurance company was unwilling to assume the responsibility, not only for such defense but for its liability as well." Further clarifying the protection to be afforded the insured's right to defend, the court said,

> "It is unnecessary that plaintiff [the insured] should be actually prejudiced by the conduct of the insurer in assuming control of the defense of the * * * action and plaintiff need not show that it could have achieved a better result in that case had defendant not interfered. It will be conclusively presumed that plaintiff building corporation was prejudiced by the conduct of the insurer in assuming its defense." Id. at 530–531, 5 N.E.2d at 778.

This rule in favor of presuming prejudice is given a very sensible explanation in the decision of the Kansas City Court of Appeals in Fairbanks Canning Co. v. London Guaranty & Accident Co., 154 Mo.App. 327, 133 S.W. 664 (1911). This decision was relied upon in the Illinois appellate court case of Columbian Three Color Co. v. Aetna Life Ins. Co., supra, and in Salerno v. Western Casualty & Surety Co., 336 F.2d 14 (8th Cir.1964). In *Fairbanks Canning* the court held that an insurance company was estopped to deny liability on a policy because it had undertaken the insured's defense for about six months and then withdrawn as the case was "approaching trial." The court considered the various legal doctrines which have been applied in order to enforce liability upon an insurer which has conducted itself in such a manner:

> "Such action is sometimes said to constitute an estoppel in pais; sometimes it is denominated an election of position which cannot afterwards be changed; sometimes it is said to be a contemporaneous construction of the contract by the party claimed to be bound; and yet again it so [sic] called a waiver. But, in whatever way it may be designated it is such conduct on the part of the insurer as will cut him out of a defense he might have made had he insisted upon it at a time when the other party might have taken care of himself to his complete exculpation, or, at least, a betterment of his condition. If, instead of relying upon his right when the claim was first brought to his attention, he, without due investigation, assumes himself to be liable, sets the assured aside and claims the right of control of the defense, he cannot afterwards ignore the right the assured has acquired by reason of such action merely because he has made a belated discovery of fact, or law, which he thinks puts the case outside the terms of the policy." 133 S.W. at 666. (Citations omitted.)

This language is highly relevant to the conduct of defendants in the present case. Additionally, the court explained that prejudice should be presumed to exist where the insured has been deprived of its right to conduct its own defense:

> "Who can say what plaintiff [the insured] might have done in its own behalf had it not been ousted from control and direction of the defense * * *? If a man is to bear the burden of the result of a defense to an action, it is his privilege to have his own personality appear in its course. He is entitled to have the results measured up to him, and not to some other. * * * The loss of a right to control and manage one's own case is itself a prejudice. * * * [O]ne 'must be presumed to have been prejudiced by such conduct, and need not be put to the proof that

it could have achieved better results.'" Id. at 667.

Defendants seek some comfort in the language found in King v. Aetna Insurance Co., 31 Ill.App.2d 462, 465, 176 N. E.2d 689 (1961), to the effect that "prejudice is not necessarily presumed" in cases of this sort. The facts in *King*, however, are not at all similar to the facts here. The insurer there withdrew while the case was still in the pleading stage, and the court in which the withdrawal occurred ruled that the withdrawal was in compliance with the rules. This is a far cry from a withdrawal nineteen months after the appearance was entered, after all discovery and preparation for trial had been completed and the case was pending for trial.

■ Although each of the above cases involves a dispute between an insured and its carrier, I can see no reason for not applying the same principles to the facts of this case, where the controversy is between an insurer and the indemnitee of its insured. The estoppel doctrine is designed to protect a party from unfair injury or disadvantage. Ford and I.N.A. are obviously the injured parties here, and Commissary actually stands in the same position as its insurer, Zurich. When Zurich undertook the defense of Ford, it was acting on behalf of both Commissary and Ford; when it withdrew from the defense, however, it did not harm Commissary, but it did harm Ford. In fairness I can see no reason to limit the estoppel rule in insurance cases to benefit only the party who is directly insured under the policy. In Snyder for use of Brooks v. United States Mutual Insurance Co., 312 Ill.App. 337, 346, 38 N.E.2d 540 (1941), the court was willing to allow the estoppel doctrine to be applied against an insurance company by the persons who were injured by the insured. In the Lincoln Park Arms decision, supra, 287 Ill.App. at 532, 5 N.E.2d at 778, there is dictim in which the court seems to approve the position that

"one other than the assured named in an insurance contract may recover against the insurer on the theory of estoppel."

The present case thus is susceptible to application of the estoppel doctrine in order to protect the rights of Ford and I.N.A.

The facts before me present a very strong case for application of the estoppel doctrine. Here the defense had already been under the control of defendants for about nineteen months when they withdrew from the case. At that time the accident was already over three years in the past, and the case was being held day to day for trial. As early as May, 1965 defendants plainly were in possession of all of the significant information and legal documents pertaining to the accident, and to the relationship between Commissary and Ford. Nevertheless, defendants did not withdraw from the defense until November, 1966, and there has been no explanation given for this delay. The "information" which defendants described on November 3, 1966 as having "recently" come to them has not been identified or explained here.

Even though the evidence introduced at the trial may have strongly suggested that Ford's negligence was the sole cause of the accident, Ford was entitled to consider, investigate, and present defenses founded on other theories. One such theory might have been that it was actually the negligence of Commissary, rather than of Ford alone, which was the cause of the accident or at least was a contributing cause. As a practical matter, Zurich was unlikely to try to prove negligence on the part of its own insured, Commissary, in order to absolve Ford. This is true even though Commissary was insulated from further liability to Hurd because it had paid workmen's compensation to her through Zurich. I do not suggest that defendants were in any way unfair to Ford in their preparation of the defense during the time they controlled it. I only suggest that the extended time during which Ford justifiably relied upon defendants,

and the tardy withdrawal of defendants from the case, unfairly deprived Ford and its insurance company of the opportunity to consider all possible lines of defense.

Shortly after defendants undertook the defense, the defense attorneys supplied Zurich with a letter commenting on the posture of the case. This letter, in May, 1965, stated, "[T]he only complete defense available is the plaintiff's own lack of due care." There is nothing before me to indicate that any other line of defense was later pursued, although I have mentioned one other possible approach. If Ford was going to have to bear the burden of an adverse judgment, it at least should have been given the opportunity to conduct its own investigation, to prepare its own defense, and to engage in its own settlement negotiations.

It is no answer to these considerations to say that after defendants' withdrawal from the suit plaintiffs were left in control of the litigation and with the same counsel they had originally chosen. In Ashland Window & Housecleaning Co. v. Metropolitan Casualty Ins. Co., 269 App.Div. 31, 53 N.Y.S.2d 677 (1945), the insurer had disavowed liability on behalf of the insured and withdrawn from defense of a claim against the insured at a time when the case had already been marked ready for trial on the court's calendar for two weeks. The insured obtained new counsel and an additional two-week delay before trial began. As proof of prejudice, in its subsequent suit against the insurer for the amount of the judgment against it, the insured argued that it "was forced to proceed with the trial in the Federal Court without sufficient preparation." 53 N.Y.S. 2d at 679. The New York court held that this argument, and others offered by the insured, presented issues of fact to be decided by a jury on the question of prejudice.

After the sudden change of positions when Commissary and Zurich announced that they would no longer defend Ford, the defendants' attorney found himself in the middle of a controversy between his two sets of clients. He properly attempted to withdraw, but with the case already on the trial call the court properly denied him leave to withdraw and required unwilling counsel to proceed. This counsel had not prepared the case in consultation with Ford, but rather with defendants, whose interests were different from Ford's in respects which I have noted. Being forced to proceed with this counsel to a trial which began in less than two weeks, Ford was deprived of its right to be represented throughout the proceedings by an attorney who owed his sole allegiance to Ford. This deprivation was the result of the unreasonable, unexplained delay of defendants before they withdrew.

■ In a case such as this, it is impossible to prove with any degree of certainty that Ford would have achieved a better result if it had been allowed to conduct its own defense throughout the litigation. It is sufficient to show that some prejudice may have resulted to Ford by reason of the conduct of the defendants. Ford justifiably relied upon the agreement and undertaking of Commissary and Zurich to take over the defense of this lawsuit. My conclusion is that it would be unfair to Ford, under all of the circumstances shown here, to relieve defendants of their earlier assumption of liability. For the reasons I have indicated, defendants should be estopped to deny liability under the indemnity provision of the contract.

Accordingly, judgment under Count II of the complaint must be for the plaintiffs and judgment on the counterclaim presented by defendants must be for the plaintiffs.

Plaintiffs are directed to prepare and present on or before April 10, 1968, a judgment order in accordance with the foregoing opinion.