Albert C. Jones, Plaintiff-Appellee, v. S. S. and E. Corporation, Defendant, and Robert P. Tonietto, Defendant-Appellant.
Robert P. Tonietto, Third-Party Plaintiff-Appellee, v. Dave Gambino, Third-Party Defendant-Appellant.

**Gen. No. 51,972.**

First District, Fourth Division.

June 11, 1969.

Rehearing denied September 8, 1969.

Hinshaw, Culbertson, Moelmann & Hoban, of Chicago (Leonel I. Hatch, Jr., and D. Kendall Griffith, of counsel), and Jerome M. Brooks and Gilbert Gordon, of Chicago (Gilbert Gordon, of counsel), for appellants.

Epton, McCarthy, Bohling & Druth, of Chicago (Bernard E. Epton, Edward A. McCarthy and Donald Segal, of counsel), for appellee.

MR. PRESIDING JUSTICE DRUCKER delivered the opinion of the court.

The case in chief was brought to recover damages occasioned by an alleged violation of the Structural Work Act by defendants Robert P. Tonietto and S. S. and E. Corporation. A third party action was brought by Robert P. Tonietto, a general contractor, against Dave Gambino, a subcontractor. In the case in chief, after a jury trial, a judgment of $50,000 was entered against both defendants. In the third party action, heard after the case in chief, the jury found in favor of third party defendant Gambino, but the court entered a judgment notwithstanding the verdict in favor of third party plaintiff Tonietto for $50,000.

Defendant Tonietto appeals from the judgment in the case in chief, and third party defendant Gambino appeals from the judgment notwithstanding the verdict entered in the third party action. S. S. and E. Corporation has not filed an appeal.

Plaintiff sued for injuries sustained on a building project for S. S. and E. Corporation while employed by Gambino, a subcontractor for Tonietto, the general contractor.

Defendant Tonietto raises three points on appeal: (1) that the court should have directed a verdict in favor of defendant or entered a judgment in his favor notwith-

81

standing the verdict because defendant was not in charge of the work and because there is no adequate evidence of a violation of the Structural Work Act; (2) that the verdict is contrary to the manifest weight of the evidence; and (3) that the court erred in giving an instruction that the jury may consider a violation of a provision of the Health and Safety Act requiring the use of ladders on certain types of scaffolding. No question is raised as to the amount of the damages.

Third party defendant Gambino raises the single point on appeal that the trial court improperly invaded the province of the jury by arrogating to itself the prerogative of weighing the evidence despite the fact that there was substantial and credible evidence in the record to support the jury finding.

*CASE IN CHIEF*

*Evidence*

*Testimony of Albert C. Jones, plaintiff:*

He was in Chicago working as a bricklayer for Gambino on March 8, 1960; he had been a bricklayer for fifteen years. On that date he was constructing a wall and chimney in a building on Laramie Avenue in Cicero. He was working on a scaffold of patent scaffolding which was constructed for masonry use with steel and planks.

The scaffolding is made of pipes and cross braces to hold it together, and is overlaid with planks (2 x 8, or 2 x 10) on which the masons walk and stand to do their work. There were scaffolds five feet high on the west wall and ten feet high on the south wall. The planks on the west scaffold were bearing on the planks of the south scaffold; and the plaintiff was working on the south scaffold.

At 4:40 p. m. (quitting time) plaintiff started off the higher scaffold. In getting down plaintiff laid his level on the planking of the higher scaffolding, came down to the lower scaffolding and reached back to get his level.

He then walked to a corner of the lower scaffolding, stepped on a plank, which broke, and he fell. The plank broke at a bearing where the planks on the south wall scaffold crossed the planks on the west wall scaffold.

As he lay on the floor beneath the broken scaffold he noticed that it was the plank on the lower scaffold that had broken and allowed various items to fall upon him; he also noticed that there was not another steel jack under the middle of the scaffold to help carry the weight. (A jack is a perpendicular rod that helps support planks.)

The general contractor on the job was Tonietto who was generally at the job several times a day. The witness saw no ladders anywhere on the job. He had nothing to do with the erection of the scaffold. It was erected by two laborers whom he did not supervise.

When plaintiff fell he landed on his foot doubling his leg up under him and then falling onto his back; bricks and other items fell off of the scaffold onto him. The bricks were about $2\frac{1}{4}$ x 8″, 4 x 8″ bricks (common bricks). He immediately noticed pain in his left foot and called for help.

The scaffold was erected on the subflooring, and he fell onto the subflooring from the scaffold. Subflooring is usually pine or other material of three and one-half or four foot widths; it has larger boards than the hardwood flooring. He did not observe that one of the legs of the scaffold went through the flooring.

Generally in the building of a scaffold there is a climb space left on the inside away from the wall; however, if five planks are put on the scaffold, as was done in the instant case, then the climb space is covered up.

The scaffolding that was on the job on March 8 was the same scaffolding that had been in use for the previous four weeks. He does not know if it is custom and usage to leave planking on a five foot level rest on the planking leading to a scaffold supporting the ten foot level. It was

not done on the other scaffolding on this job or on the twin job next door. The scaffold on the building next door had an extra jack for support under it.

The upper length of scaffolding had only been in place about an hour and a half before the accident. It was constructed after he finished bricking the wall in order for him to get up to the chimney; until that time it had been a five foot section plus the legs. The lower scaffold on the west wall was built while he was on the ten foot scaffold working on the chimney; he did not notice the absence of the jack at that time.

The usual way to get up onto a scaffold is to use ladders. On this job he got to the ten foot level by climbing to the five foot level and then climbing to the ten foot level. (There was a model on which this was demonstrated.) The sides of the scaffold are built like a ladder and are used for climbing.

Ladders come in all different lengths. For a ten foot scaffold there should be a twelve or fourteen foot ladder which would stand out on the floor, leaning like a stairway for a person to walk up.

He does not remember testifying on a deposition that the scaffold next to the chimney had four boards on it. He does not remember telling a private investigator that the scaffold belonged to Mr. Gambino and is one normally used on his jobs; he did say that there was nothing wrong with the scaffold other than the board breaking.

He did not jump from the ten foot section to the five foot section.

*Testimony of Robert P. Tonietto, defendant,* called by plaintiff as an adverse witness under Section 60 of the Civil Practice Act:

He was in business on March 8, 1960, as Gregg Builders. He did remodeling and building and was involved in the construction of a building at 3220 South Laramie at that time in the capacity of general contractor. He had

been hired by S. S. and E. Corporation some time prior to the beginning of the year.

The agreement was to construct two three-flats; reverse twins. Plans were drawn up by a draftsman, Dino J. Carradi. He did not work on the actual drawing. Carradi worked for the architectural firm of Novy & Company; the witness paid Carradi to do the plans and Carradi never met with anyone from S. S. and E. Corporation regarding them.

Witness was associated with S. S. and E. Corporation in the capacity of Secretary. Concerning the building in question, he met with Carradi in 1959 while the plans were being drawn up; it was some time before he was hired as general contractor.

Gambino was one of about eighteen subcontractors that he used on this job; there was an oral agreement with Gambino. On March 8, 1960, the deck or ceiling of the garden apartment was on, and they were working on the second deck. On that day just the masonry trade was working there. He visited the job site every day and sometimes two or three times a day. He was on the job site on the day of the accident but left before the accident occurred. On that day he observed scaffolding in the area where the masons were working, along the south and west walls; there was a double section along the south wall where the chimney was. He never got closer than 70 feet to the scaffolding that day.

There were ladders in the job area, and there was a mason ladder. This is a carpenter made (rather than store bought) ladder and is made from two by fours nailed across each other. He does not remember where in relation to the scaffolding the ladder was; he had seen it in several locations around the job site at different times. The carpenter's ladder was not on the scaffolding. He never discussed the erection of scaffolding with anyone. He does not know if there is a rule or regulation regarding scaffolding to the effect ladders are supposed

to be provided for workmen to get up and down from the scaffold. He never discussed any such rule with Gambino. He never inspected the scaffolding on any of his jobs over the preceding fifteen years.

He would discuss the plans with each subcontractor as necessary. He made some changes in the plans himself. He never discussed any changes directly with the workmen. He never inspected any of the equipment used by the trades, nor did he discuss the equipment being used by Gambino. On March 8 he did not notice anything on the scaffolding which he considered faulty.

He noticed damage to the subflooring a day or two after the accident. There was a hole in the subflooring, in the southwest corner, near one of the legs of the scaffolding. The hole was four or five inches square. The hole was called to his attention by someone else; you could see the hole from about ten feet away if you looked right at it.

He looked at the work of each subcontractor after it was finished to determine if it was according to the plans and specifications. Other than this checking to see if the work was done according to specifications, he had no other supervisory capacity on the job.

*Testimony of David Gambino,* witness for plaintiff:

He has been a mason contractor since 1959. On March 8, 1960, approximately five men were working for him. This included the plaintiff who had been in his employ for six to eight months.

He saw the plans and specifications of the building during the bidding stage. When there was masonry work to be done either Tonietto notified him or he would go past the building and observe for himself. The plans and specifications were given to him prior to the commencement of construction and were in his possession through the construction of the building; no changes were made on the masonry work at the time it began.

On March 8 scaffolding was put up for the masons to work on; it was put up by the laborers employed by the witness; none of the masons participated in the erection of the scaffolding. Scaffolding was going up throughout the day. In the morning the scaffolding of the south wall was completed; it was patent metal scaffolding which ran the entire length of the wall and was spanned by two by ten planks. It was built one level at a time, and this was a four or five foot level.

The next time he saw the scaffolding was late in the afternoon. At that time some work had been completed and part of the scaffolding had been dismantled. There was a double section left alongside of the chimney. A double level is two sections of patent scaffolding, one section on top of the other, joined by metal pins, and the top section spanned by plank. The top section was between eight and ten feet high. The scaffolding east of the double section had been dismantled. There was still scaffolding along the west wall and the north wall. This was patent scaffolding spanned by two by ten planks and was four or five feet high. The scaffolding along the west wall would have to run from the north wall to the south wall; it did not actually meet the scaffolding along the south wall. There was an open space along the south wall; the plank did not extend all the way to the south wall.

At the southeast corner there was a section of scaffolding next to the double section which was being used for work on the chimney; then there was scaffolding across the west wall which joined the scaffolding at the north wall. The planks from the west wall overlapped the planks from the north wall. Four planks from the west wall overlapped the planks on the south wall.

At about 3:30 that afternoon he saw bricks and an occasional mortar board on the west scaffolding; there were approximately four or five piles of bricks totaling forty

to fifty bricks in a pile. A brick could weigh from three and one-half to four and one-half pounds. The planks holding the material were eight and sixteen feet in length. The planking and the scaffolding are owned by the witness.

At 3:30 all of the bricklayers except plaintiff had gone over to the north wall; plaintiff remained on the double scaffold to finish work on the chimney. There were ladders about the job site. There was one between the first and second floors of the building; there was a ladder owned by the witness which was kept in a truck which was left on the job site. The witness did not see his ladder on either the first or second floor where the work was going on.

He was on the job site when plaintiff had his accident. It was 4:30 (quitting time) and he had just sent Tony Duska up on the double scaffolding to help plaintiff set the chimney cap. He observed plaintiff after his fall. He was in the southwest corner facing southeasterly; he was holding one leg just above the ankle. The scaffold planks were all disarranged and one plank was broken; the northeast leg of one section of scaffolding was driven through the subflooring right in the corner. There were two pieces of broken plank but he could not tell what position the plank had been in before the accident; the other planks ran diagonally from the scaffolding to the floor. The scaffolding went through the subflooring up to the first rung, a distance of about fourteen or fifteen inches.

Four planks were used on this scaffolding on both the south and west walls. The planks were banded with metal strapping; they are cut diagonally across the corner, at about a three inch diagonal, to avoid the sensitivity of cracking at the corners, and then again they were strapped with metal banding. The planks were made of red fir which is better than construction grade lumber (generally spruce or cheaper varieties).

On March 8, 1960, he was not aware of a rule regarding the use of ladders on scaffolding; he later became aware of a rule which required that ladders are to be provided for scaffolding constructed in more than one level.

It is customary for the workers to ascend the scaffolding on the inside of the scaffold section; it would be impossible to do so over the outside because of the projection of the plank beyond the scaffolding.

Just before the accident he was looking up at Duska and giving him some instruction to remove the remaining bricks on the scaffold. Duska was on the east end of the ten foot level near the second five foot section. He kicked a brick off the scaffold which hit Clyde Mosher in the head. At about that same time he noticed plaintiff coming over to the south end of the scaffold and getting in a crouched position, ready to jump from the higher to a lower scaffold section. He had tools under his arm and he jumped toward the lower section. Just as he jumped is when Mosher was hit by the brick, and the witness' attention was drawn away from plaintiff. He then heard a crash in the corner; the scaffolding came tumbling down and he found plaintiff underneath. The entire scaffold did not collapse, it was just in the corner; thus there were remaining piles of brick on the scaffolding after plaintiff fell. He did not see any forty or fifty bricks around plaintiff after he fell.

The leg of the scaffold was driven through the subflooring about fourteen or fifteen inches. The hole in the subflooring could not have been there before the accident or the scaffold would not have stood erect. Plaintiff had the level tucked under his arm and he had the remainder of his tools (trowel and hammer) in his hand.

There was a truck in which the scaffolding was brought to the job and there was a ladder in that truck. The truck is normally parked at the job site and left there as long as the scaffolding is there. The ladder was half

of an extension ladder and was approximately twelve feet high; it was a commercially built ladder as opposed to a carpenter's ladder. The ladder was on the truck before this job; it was part of the standard equipment. This ladder was never used to ascend or descend from the scaffold. He does not know where on the other scaffold plaintiff landed after his jump.

He saw plaintiff jump; and the last time he saw him plaintiff was in mid-air. Plaintiff placed his hand on the plank and leapt, and at that instant the witness' attention was drawn by the groans of Mosher who had been hit by a brick.

*Testimony of Tony Dinito,* witness for the defense:

He is an assistant claims manager for Pecan Van Lines, a trucking company. He did investigative work back in 1961. He recalls a two page signed statement taken from the plaintiff. The statement says that the scaffold belonged to Mr. Gambino and was one used normally on the jobs. The statement says there was nothing wrong with the scaffold other than the board breaking; and that defective boards are usually taken out before they break.

He does not remember the particular statement of plaintiff. All he remembers is what he recalls from the statement.

*Testimony of Robert P. Tonietto,* a defendant:

He is the same Robert P. Tonietto who testified earlier. He did not provide any of the equipment used by the subcontractors on the job in question. He did not retain any agreement with the subcontractors that gave him the right to tell them how to do their work. He did not have any written contracts with anybody. In his oral contracts he retained the right to tell them how to do the work. He did not retain the right to tell them how to erect their equipment on the job.

90

The contract with the mason contractor called for the latter to provide all labor, materials and equipment. He does not have any knowledge of the manner in which masonry scaffolds were constructed.

He has been in the contracting business for fifteen years and did have occasion to observe scaffolding during that time. He never discussed compliance with any safety rules and regulations with Gambino or any other subcontractors. There was no provision in the verbal agreement concerning anything that he could do if he saw any workman doing anything which he believed to be unsafe.

He could not tell the subcontractors how to do their work, the manner in which they would do it. But he could tell them something regarding the way they were doing the work as it applied to the plans and specifications.

*Opinion*

Defendant's first contention is that the trial court should have granted his motions for directed verdict or for judgment notwithstanding the verdict. He argues that the evidence is insufficient to prove that he was in charge of the work, that there was any violation of the Structural Work Act, or that he violated the Act.

To sustain defendant's contention that he is entitled to a directed verdict or a judgment notwithstanding the verdict, it is necessary that this court find that "all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors movant that no contrary verdict could stand." Pedrick v. Peoria and Eastern R. Co., 37 Ill2d 494, 510, 229 NE2d 504.

The relevant provision of the Structural Work Act, Ill Rev Stats 1959, c 48, § 69, states:

> Any owner, contractor, sub-contractor . . . having charge of the erection, construction, repairing,

91

alteration, removal or painting of any building, . . . shall comply with . . . [the provisions of the statute].

Defendant contends that several uncontroverted facts establish as a matter of law that he was not in charge of the work in connection with which plaintiff was injured. Defendant points out that the plaintiff was injured while doing masonry work which had been subcontracted to Gambino; that the scaffold upon which plaintiff was injured was constructed by Gambino; that defendant did not supervise or direct Gambino or his employees; and that his only duty was to see that the work was done according to plans and specifications and that the job was going according to schedule. The argument is that by subcontracting the work, the defendant rid himself of any "in charge of the work" status and that he did nothing thereafter to become "in charge of the work."

In Larson v. Commonwealth Edison Co., 33 Ill2d 316, 211 NE2d 247, the Illinois Supreme Court was faced with a very similar set of circumstances. In Larson, defendant was the owner of property upon which it was having repairs and additions made. It let many contracts for the work through a firm of consulting engineers. One of the contracts was let to Paschen (plaintiff's employer) who negligently constructed a scaffold from which plaintiff fell and was injured. The evidence showed that six employees of defendant, all members of its station construction department, were on the job at all times. They exercised no control over the work but merely inspected to see that the terms and specifications were complied with. Their inspection did not extend to the kind or safety of scaffold employed. Representatives of defendant's safety department also visited the site periodically; and while their primary concern was the safety of defendant's operating personnel still on the premises, they could only make but not enforce safety suggestions to the contractors and their employees.

In that case the court specifically declined to limit the meaning of persons "in charge of the work" to the person or persons who actually erect a scaffold. The court further found error in the trial court's attempt to define "in charge of the work" as "retaining control and supervision of such work being performed by [subcontractor]." The court stated at page 321:

"While it may be conceded that some of the decisions in this jurisdiction involving the Scaffold Act appear to have equated 'having charge' with 'supervision and control' in varying degrees, it is our opinion the language of the statute, and the legislative intent it reflects, do not permit the conclusion that the terms are the inflexible and unbending legal equivalent of the other. The term 'having charge of' is a generic term of broad import, and although it may include supervision and control, it is not confined to it. . . . Thus, while the actual exercise of supervision and control over the work and the persons doing it, or the retention of the right to so supervise and control, may be factors bearing on the ultimate factual question of whether an owner is 'in charge,' they are not necessary or conclusive factors, nor is either made a sine qua non for liability under the statute. Rather, consistent with its beneficient [sic] purpose of preventing injury to persons employed in the extra-hazardous occupation of structural work, the thrust of the statute is not confined to those who perform, or supervise, or control, or who retain the right to supervise and control, the actual work from which the injury arises, but, to insure maximum protection, is made to extend to owners and others who have charge of the erection or alteration of any building or structure."

93

In the instant case where defendant admits that he was frequently on the premises; where, as in the Larson case, he was to see that the work proceeded on schedule and according to the terms and specifications of the contract (even though there was testimony that he exercised no control over the work); where he had the authority to make some changes in the plans; and where his inspections did not extend to the kind or safety of the scaffold employed; we hold that, under the rule of Larson, the evidence does not so overwhelmingly favor defendant that no contrary verdict could stand, nor is the jury's finding that defendant was "in charge of the work" against the manifest weight of the evidence on this issue.

▪ Defendant next contends that there was no adequate evidence of a violation of the Structural Work Act which provides in pertinent part that all scaffolds:

". . . shall be so erected and constructed, placed and operated as to give proper and adequate protection to the life and limb of any person or persons employed or engaged thereon . . . [Ill Rev Stats, 1965, c 48, § 60]."

In the instant case there is evidence that the board did break while being used by plaintiff; that a jack which was used in a similar scaffold in an adjacent building was not used on the scaffold in question; and that there was no real ladder on the scaffold. We therefore cannot find that all the evidence, viewed most favorably to the plaintiff, overwhelmingly favored defendant. Pedrick v. Peoria, supra.

▪ Nor can we so find as to defendant's claim that there was no evidence as to defendant having "wilfully" violated the Structural Work Act. The absence of a ladder and the failure to support the scaffold with another jack were evidence of conditions that should have been discovered by the exercise of reasonable care. Old-

ham v. Kubinski, 37 Ill App2d 65, 88, 185 NE2d 270; Kennerly v. Shell Oil Co., 13 Ill2d 431, 439, 150 NE2d 134.

■ In view of all the foregoing, we believe the verdict was supported by evidence and that it is not against the manifest weight of the evidence.

Defendant finally contends that the court erred in giving Plaintiff's Instruction No. 17. It stated:

> "There was in force in the State of Illinois at the time of the occurrence in question a certain Statute commonly known as the Health and Safety Act which provided, in part, as follows:
>
> "Supervision. The erection, use, alteration, and removal of scaffolding and staging shall be done under competent direction and supervision.
>
> "Where Required. Where a runway, stairway, or safe means of access to a scaffold is not provided, a ladder shall be provided for all such scaffold platforms more than six (6) feet above the ground or floor.
>
> "Placement. Ladders to be used continuously at one place shall be securely fastened at the top and bottom. The top shall extend not less than thirty-six (36) inches above the platform or floor served and the landing rung shall be as close to the level of the floor or platform as possible.
>
> "If you decide that a party violated the Health and Safety Act on the occasion in question, then you may consider that fact together with all the other facts and circumstances in evidence in determining whether or not a party wilfully violated the provisions of the Structural Work Act."

The operative language of the Health and Safety Act (Ill Rev Stats 1965, c 48, §§ 137.1–137.21) is as follows:

> "It shall be the duty of every employer under this Act to provide reasonable protection for the lives,

95

health and safety of all persons *employed by such employer.* The Industrial Commission shall, from time to time, make, promulgate and publish such reasonable rules as will effectuate such purposes. [Emphasis added.] Ill Rev Stats, 1965, c 48, § 137.3."

Defendant argues that he did not employ the plaintiff and thus the Health and Safety Act does not apply to him vis-a-vis the plaintiff.

The language of the Act is clear; the Act is only meant to apply to "employers." Thus in the instant case the Act would be relevant to the relationship between plaintiff and third party defendant Gambino, but it does not apply to the relationship between plaintiff and defendant. Plaintiff also refers us to the rules of interpretation promulgated under the authority of Section 3 of the Health and Safety Act,* Ill Rev Stats 1965, c 48, § 137.3, and argues that they require a liberal interpretation of the scope of the safety rules. However, since, as we have explained, the relationship of Tonietto and plaintiff does not come within the coverage of the Act, and since the scope of the Act cannot be expanded by the rules of interpretation promulgated under it, this argument is unavailing. The instruction was therefore prejudicial to defendant. See Creamer v. Rude, 37 Ill App2d 148, 156, 185 NE2d 345.

Plaintiff argues, though, that the safety code of the Health and Safety Act is admissible for purposes of establishing the standard of care in the community, citing Darling v. Charleston Community Memorial Hos-

---

* Section 5, "Interpretation of Rules."

"Rule 1. General Interpretations: the following interpretations shall apply in connection with all rules made by the 'Industrial Commission':

"A. These rules shall be interpreted liberally so as to effectuate their intent of providing reasonable protection to the lives, health and safety of employees within a scope authorized by statute."

96

pital, 33 Ill2d 326, 211 NE2d 253. In that case the court held that the introduction into evidence of regulations, standards and by-laws performed the same function as did evidence of custom. The court said at page 332:

> "This evidence aided the jury in deciding what was feasible and what the defendant knew or should have known. It did not conclusively determine the standard of care and *the jury was not instructed that it did.* [Emphasis added.]"

Since we were not briefed on the subject, we make no finding as to whether evidence of standards under the Health and Safety Act would have been admissible as such. See dicta in Clements v. Schless Const. Co., Inc., 91 Ill App2d 19, 26, 234 NE2d 578, and Larson v. Commonwealth Edison Co., 33 Ill2d 316, 211 NE2d 247.

This instruction was also prejudicial because it advised the jury to consider whether defendant violated the Act and then instructed them to take that violation into account in their resolution of the principal case. The form of this instruction as given was not consistent with a theory of standards of care; rather, it was predicated on a violation of a statute. Since we have ruled that the defendant could not have violated the Health and Safety Act, the instruction was certainly prejudicial to the defendant and a new trial must be granted. We thus reverse the judgment and remand the case in chief for a new trial in a manner not inconsistent with this opinion.

■ Third party defendant has appealed the entry of a judgment notwithstanding the verdict against him on the ground that the trial court improperly invaded the province of the jury by arrogating to itself the prerogative of weighing the evidence despite the fact that there was substantial and credible evidence in the record to support the jury finding. Since we have remanded the

case in chief for a new trial, there may be no remaining basis for the third party action as it is dependent upon the outcome of the case in chief. See Bohannon v. Ryerson and Sons, Inc., 15 Ill2d 470, 475, 155 NE2d 585. Further, the error in the case in chief which is the basis for a new trial may have infected the third party action (the record from the case in chief was incorporated in toto into the third party action). Therefore, we are also reversing the judgment in the third party action and remanding it for a new trial.

Reversed and remanded for new trials.

ENGLISH and STAMOS, JJ., concur.