**Keith SCHROEDER, a minor, etc., Plaintiff-Appellee,**

**v.**

**C. F. BRAUN & CO. et al., Appellees-Appellants,**

**v.**

**COOLING TOWER ERECTORS, INC., Third-Party-Defendant-Appellant.**

**Nos. 73–1209 to 73–1213.**

United States Court of Appeals, Seventh Circuit.

Heard May 23, 1974.

Decided Aug. 22, 1974.

---

James T. Ferrini, Robert S. Soderstrom, Marvin Riman, Francis D. Morrissey, Chicago, Ill., for appellees-appellants.

Sidney Z. Karasik, Philip H. Corboy, Chicago Ill., for plaintiff-appellee.

Before SWYGERT, Chief Judge, CUMMINGS, Circuit Judge, and MATTHES, Senior Circuit Judge.[1]

CUMMINGS, Circuit Judge.

In his second amended complaint, plaintiff sued four companies for injuries he suffered in Morris, Illinois, on

---

1. Senior Circuit Judge M. C. Matthes of the Eighth Circuit is sitting by designation.

April 20, 1971. The complaint contained appropriate allegations of diversity and jurisdictional amount under 28 U.S.C. § 1332.

Plaintiff was an employee of Cooling Tower Erectors, Inc. ("Cooling"). Defendant Northern Petrochemical Company ("Northern Petro") had contracted with the general contractor, defendant C. F. Braun & Co. ("Braun") for Braun's construction of a polyethylene plant, including a water cooling tower, on Northern Petro's premises at Morris, Illinois.

Braun thereafter entered into a subcontract with defendant Fluor Cooling Products Company ("Fluor") to construct the cooling tower. Fluor then hired plaintiff's employer, Cooling, to erect the structure according to blueprints and with a kit of parts supplied by Fluor. Defendant Northern Natural Gas Company ("Northern Natural") allegedly provided supervisory personnel to defendant Northern Petro, its wholly owned subsidiary, in connection with the erection of the tower.

According to the complaint, the four defendants had charge of the erection and construction of the cooling tower within the meaning of the Illinois Structural Work Act (Ill.Rev.Stats.1973, ch. 48, §§ 60–69). They allegedly violated that Act by failing "to provide ladders which were reasonably necessary to give proper and adequate protection to the life and ·limb of persons engaged" in work on this structure. Plaintiff claimed that his fall from the cooling tower was caused by this violation of the Structural Work Act. He sought $500,000 damages.

Northern Natural and Northern Petro filed cross-actions against Braun and Fluor and a third-party action against Cooling, alleging both contractual and common law indemnity.

Braun filed a cross-action against Fluor for contractual and common law indemnity, and an action against Cooling for common law indemnity. Fluor also filed an action against Cooling for contractual and common law indemnity.

The jury returned a verdict in plaintiff's favor against all defendants in the sum of $252,106.20. Judgment was entered thereon.

The jury was instructed that if it found for any cross-claimants or third-party plaintiffs, it "should assess the damages in the same amount as [it] found for plaintiff." In violation of this instruction, the jury apportioned its award to plaintiff among nine indemnity verdicts. The trial court impounded the erroneous verdicts returned on the indemnity claims and submitted new verdicts to the jury, directing it to return verdicts in the amount of $252,106.20 in favor of each indemnitee and against each indemnitor. The jury thereupon returned verdicts in favor of Northern Natural and Northern Petro against Braun, Fluor and Cooling. Verdicts were also returned in favor of Braun against Fluor and Cooling. A verdict was returned in favor of Fluor against Cooling. Judgments were entered on these nine verdicts, each for $252,106.20, resulting in this appeal by Cooling.

After the foregoing verdicts were returned, the district court heard the claims for contractual indemnity. Thereafter, it entered judgment on the contractual claims in favor of Northern Natural against Braun and in favor of Northern Petro against Braun, Fluor and Cooling in the amount of plaintiff's verdict and for attorneys' fees of $8,742.25 and costs; in favor of Braun and against Fluor in the amount of the plaintiff's verdict and $19,263.87 for attorneys' fees,[2] plus costs; and in favor of Fluor against Cooling in the amount of plaintiff's verdict and $26,527.09 for attorneys' fees,[3] plus costs. Cooling has appealed from these judgments.

---

2. The $19,236.87 covered the Northern Companies' and Braun's attorneys' fees.

3. The $26,527.09 covered the Northern Companies' and Braun's and Fluor's attorneys' fees.

All defendants have filed appeals from the judgments in favor of plaintiff, although Cooling is the only party ultimately required to pay all damages, including attorneys' fees and costs of all parties.

The cooling tower was to be about 45 feet tall, 35 feet wide and 60 feet long. The heated water was to be pumped to the top of the structure and then allowed to trickle through baffles within the structure to a cement basin at the ground level. A large fan was eventually installed at the top of the tower to cool the trickling water.

The tower was constructed from redwood beams and has been variously described as resembling a giant erector set or huge honeycomb when finished. The only walkway was at the top of the completed structure, running parallel with its length. Access to the top level was ultimately supplied by a staircase.

When the accident occurred, the tower had been erected to its full height. Plaintiff was told by his foreman to climb to the top of the tower to pass lumber to the carpenters. At that time there were two ladders reaching only 18 feet up either side of the tower. After leaving the ladder, a workman would have to climb from beam to beam. The evidence was conflicting, but at least some adjacent beams were six feet apart.

Plaintiff's foreman later instructed him to descend to the ground to open crates. Plaintiff lowered himself from beam to beam at a point about 20 to 30 feet from one of the ladders. He lost his footing and fell to the ground about ten feet from the top of the tower.

One day after the accident, ladders had been placed on the tower reaching to its top. An architect and construction engineer testified for plaintiff that a hazard existed at the time of the accident because there were then no ladders going to the top of the tower. Additional facts are stated as they become relevant to the issues presented.

## Whether Failure to Provide a Ladder Violates the Illinois Structural Work Act

Cooling and some defendants argue that the failure to supply the ladder necessary to safeguard the workers at this cooling tower does not violate the Illinois Structural Work Act, more commonly known as the Scaffolding Act. Section 1 of the Act provides in part:

"All scaffolds, hoists, cranes, stays, ladders, supports, or other mechanical contrivances, erected or constructed by any person, firm or corporation in this State for the use in the erection, repairing, alteration, removal or painting of any house, building, bridge, viaduct, or other structure, shall be erected and constructed, in a safe, suitable and proper manner, and shall be so erected and constructed, placed and operated as to give proper and adequate protection to the life and limb of any person or persons employed or engaged thereon, or passing under or by the same, and in such manner as to prevent the falling of any material that may be used or deposited thereon." (Ill.Rev.Stat.1973, ch. 48, § 60).

Under Louis v. Barenfanger, 39 Ill.2d 445, 236 N.E.2d 724 (1968), it is clear that a permanent structure such as plaintiff was working upon is included in the beneficent scheme of the Act. *Barenfanger* also holds that "failure to furnish a protective scaffold is actionable under the Act. Since Section 1 specifically covers ladders as well, it is plain that the failure to furnish a vital ladder leading to the permanent part of the structure on which plaintiff was working violates the statute. It was for the jury to decide whether plaintiff would have used a ladder instead of climbing down the redwood beams. We cannot say that its proximate cause determination was an unreasonable one; it is fully supported by plaintiff's testimony that when the accident occurred, he had planned to climb down to the level where the available ladder ended, and then

travel horizontally at that lower level to the ladder.

Ignoring the fact that the top beam and part of a platform were already in place, Cooling argues vigorously that it was impossible to install a ladder until a complete platform had been built on top of the tower. The frivolity of the contention became manifest at oral argument, when it was admitted that the ladder could have been placed against the top of the tower; the platform would have been helpful only to give the workers a place to stand when they got off the ladder. But standing on top of the tower, and climbing on the side of it, are separate dangerous activities. Plaintiff did not fall for lack of a place to stand; he fell for want of a ladder.

### Whether Defendants Were in Charge Under the Illinois Structural Work Act

Section 9 of the Scaffolding Act places the duty of compliance upon "Any owner, contractor, sub-contractor, foreman or other persons having charge of" the work. Ill.Rev.Stat.1973, ch. 48, § 69. Here the jury concluded that each of the four defendants was sufficiently in charge of the work to impose liability under the Act.

■ The Illinois Supreme Court has determined that the phrase "having charge of" in this statute is a generic term of broad import. It includes persons who have the right to control the work, whether or not they exercise that right, but it is not confined to such persons. The statutory phrase includes those who "care for" or "have the care of" the work. The court held that the phrase is of common usage and understanding so that there is no need to explain its meaning in instructing the jury. Larson v. Commonwealth Edison Co., 33 Ill.2d 316, 321–323, 211 N.E.2d 247 (1965). Consistently with the broad guidelines laid down by the Illinois Supreme Court, the cases hold that more than one person can be "in charge" of the work. Larson, supra; Gannon v. Chicago, M. St. P. & P. Ry., 22 Ill.2d 305, 175 N.E.2d 785 (1961); Clements v. Schless Constr. Co., 91 Ill.App.2d 19, 25, 234 N.E.2d 578 (1968); Crotty v. High-Low Foods, Inc., 78 Ill.App.2d 237, 240, 223 N.E.2d 442 (1966); Yankey v. Oscar Bohlin & Sons, Inc., 37 Ill. App.2d 457, 186 N.E.2d 57 (1962).

■ Despite this sweeping definition, Cooling and some of the defendants contend that the defendants were not in charge of the work and therefore were not liable under the statute. As to Northern Natural and its subsidiary Northern Petro, the parent sent its employee, engineer Russell Penrose, to the jobsite as resident representative of its subsidiary. Penrose testified that he had a dual loyalty to these two companies. His duties were to assure the Northern Companies that the plant met the appropriate standards. He inspected the quality of the work daily and hired eight inspectors, three of whom were paid by Northern Natural, to report to him. These inspectors went to the top of the cooling tower to check the bolt connections. Penrose reported to Northern Natural daily. The activities of Penrose and his staff are sufficient to show that the two Northern Companies were in charge of the work.

■ Northern Petro's being in charge of the work is further established by its contract with its prime contractor Braun, which gave Northern Petro the right to terminate the work at any time and without cause. It required Braun to comply with Northern Petro's safety rules and with all laws and regulations pertaining to the performance of the work. Obviously, Northern Petro's right to terminate the contract put it in a position to enforce these requirements. Northern Petro was given the right to inspect the construction, including work in progress. Therefore, it was in a position to effect compliance with the Scaffolding Act, the very test advocated here by Northern counsel.

Nowicki v. Union Starch & Ref. Co., 54 Ill.2d 93, 296 N.E.2d 321 (1973), cited by the Northern Companies, did not involve the Scaffolding Act, for the count alleging a violation of that Act

was not before the Supreme Court. 54 Ill.2d 97, 296 N.E.2d 321.

In their reply brief, the Northern Companies urge that they did not have the authority to interfere with the means of doing the work and therefore were not in charge of the work within the Scaffolding Act. This ignores Northern Petro's contractual right to terminate the work without cause and to enforce safety rules. While it is true that Braun had primary safety responsibility, Jack Murch, who ran Braun's safety program, submitted accident reports to Mr. Penrose of the Northern Companies. Penrose also testified that he received confirmation from Braun's project superintendent, Larry Lawrence, "that the safety program was reasonably effective." Braun's furnishing safety information to the Northern Companies' representative shows that Braun was complying with the safety obligation imposed by Northern Petro and enforceable by Northern Petro's termination right. To this extent, the Northern Companies were in charge of the work within the Scaffolding Act.

■ Since the Northern inspectors had to climb to the top of the tower to check the bolt connections, they had actual or constructive knowledge of the absence of ladders reaching to the top of the structure. This is sufficient to impose liability upon owners having charge of the work. Schmid v. United States, 273 F.2d 172, 175 (7th Cir. 1959); see also Fentress v. United States, 431 F.2d 824, 828–829 (7th Cir. 1970). We are unwilling to upset the jury verdict merely because Penrose and his inspectors concentrated on checking the quality of the work performance.

■ Cooling has submitted that Braun, the general contractor, was not in charge of the work either. However, there was testimony that Braun personnel toured the jobsite every day and inspected for safety. Braun was contractually obligated to comply with safety rules and laws, and it imposed similar obligations on Fluor. Its subcontract with Fluor provided that Braun's safety engineer would check Fluor's "work area and operations frequently to insure compliance with safety rules." The Braun-Fluor contract listed safety requirements as one of the reasons Braun could stop the work. Braun's safety rules required daily inspection tours of the job by its safety engineer or his deputy. The rules also required that ladders be provided for scaffolds more than five feet high, with a ladder to each upper platform. This evidence is sufficient to support the jury's verdict that Braun was also in charge of the work within the meaning of the Scaffolding Act. It is highly significant that Braun does not contend otherwise.

■ Although Cooling asserts that Braun could not have been guilty of a willful violation of the Act, as seen, liability is imposed thereunder when any danger is known or could have been known in the exercise of reasonable care. Schmid v. United States, 273 F.2d 172, 175 (7th Cir. 1959). Since Braun's inspectors visited the jobsite daily and reported to Penrose of the Northern Companies, the jury could conclude that Braun had actual or constructive knowledge that there was no ladder leading to the top of the structure, even though a ladder was specifically required by Braun's own safety rules.

■ Finally, Fluor explicitly retained overall responsibility for the erection of the cooling tower by Cooling. Fluor's subcontract with Cooling gave Fluor access to the work and reserved to Fluor the right to inspect the job. Fluor's contract with Braun required Fluor to comply with Braun's and Northern Petro's safety rules and applicable laws, and placed responsibility on Fluor to inspect and to observe safety precautions. Neither Fluor's selection of Cooling to complete the work nor the absence of any Fluor employee at the worksite insulates it from liability. Buehler v. Toynan Constr. Co., 52 Ill.2d 214, 287 N.E.2d 691 (1972). There was sufficient evidence to enable the jury to find Fluor in charge of the work

*Testimony about Violation of Illinois Health and Safety Act Rules and Other Standards*

Cooling and the defendants assert that it was reversible error to permit witnesses Paul J. Campeggio and Harry L. Scoggin to testify about violations of the Illinois Health and Safety Act rules. However, Cooling's counsel first introduced this subject in considerable detail during his recross-examination of Scoggin, who testified that Part H, § 6, Rule 3(b) thereunder was inapplicable. Consequently, it was appropriate for plaintiff to bring out on redirect that Part I, § 3, Rule 30(a) thereunder required a ladder to run to scaffold platforms more than six feet above the ground where a stairway, runway or other safe means of access had not been provided. Subsequently, Campeggio was permitted to testify that his inspection of the cooling tower showed violations of the Act.

■■■ For two reasons, this evidence was admissible. First of all, the topic originated with Cooling rather than with plaintiff. Defendants did not object when Cooling first introduced the matter. Second, the Illinois Health and Safety Act Rules were admissible to establish the standard of care to be exercised by defendants. Cf. Darling v. Charleston Community Memorial Hospital, 33 Ill.2d 326, 330–332, 211 N.E.2d 253 (1965); Avery v. Moews Seed Corn Co., 131 Ill.App.2d 842, 848, 268 N.E.2d 61 (1971). The standards would aid the jury to determine if defendant had acted "in a safe, suitable and proper manner" as required by the Illinois Structural Work Act. It was also permissible to receive these witnesses' expert testimony even when dealing with the ultimate issue of the case. Merchants Nat'l Bank v. Elgin, J. & E. Ry., 49 Ill.2d 118, 122, 273 N.E.2d 809 (1971); Coleman v. Illinois Central R. R., 13 Ill.App.3d 442, 444, 300 N.E.2d 297 (1973).

■■ To support its argument that testimony about the Health and Safety Act should have been excluded, Braun relies on Jones v. S. S. and E. Corp., 112 Ill.App.2d 79, 250 N.E.2d 829 (1969).

There the court decided only that an instruction was improper because it told the jury to take into account a violation of that Act in resolving whether the Scaffolding Act had been violated. Braun's reply brief concedes that no such instruction was given here, but it complains that the court should have instructed the jury that the Health and Safety Act Rules were only admitted to establish the standard of care to be exercised by defendants. Since defendants did not tender such an instruction or object to the failure to give it, they may not now attack its absence. Rule 51, F. R.Civ.P. The court in *Jones* expressly refused to consider the point for which Braun cites the case.

■■ Although defendants object to the admission in evidence of parts of two building codes and an accident prevention manual, all dealing with construction ladders, these materials were sufficiently qualified by witness Harry L. Scoggin, an architect and consultant engineer. Such evidence of industry standards was clearly admissible in this kind of case. Darling v. Charleston Community Memorial Hospital, 33 Ill.2d 326, 211 N.E.2d 253 (1965). We disagree with Cooling that building standards were irrelevant because this tower was not a structure. The photographs appended to plaintiff's brief (his Exhibits 4 and 6) demonstrate that the cooling tower was a structure and not merely a piece of mechanical equipment as belatedly asserted in Cooling's reply brief.

Other evidentiary rulings assailed were at the most harmless error considering the overwhelming evidence that the Scaffolding Act had been violated. Likewise the court's passing, jocular comment that perhaps defendants should have joined the organizations that devised standards for the performance of construction work could not have fatally prejudiced the jury in favor of plaintiff. No trial objection was even made to the comment.

*Excessiveness of Verdict*

Cooling, Braun and the Northern Companies assert that the $252,106.20

verdicts were excessive and include an award for future wage loss which has no evidentiary support. In his argument to the jury, plaintiff's counsel never made the point that his client would lose wages or earning power in the future. This speculation for attacking the jury's verdict is therefore without merit.

 The testimony does show that plaintiff suffered substantial physical injuries and was forced to switch from his chosen future profession of animal science to agricultural economics. Further surgery will be necessary, and plaintiff will continue to have a disrupted sacroiliac joint which will prevent him from engaging in any heavy work or long standing. In this setting, it would be inappropriate for us to substitute our judgment for the jury's. Kaspar v. Clinton-Jackson Corp., 118 Ill. App.2d 364, 374, 254 N.E.2d 826 (1969).

*Claims for Contractual Indemnity*

Northern Natural secured a judgment against Braun based upon contract.

Northern Petro secured judgments against Braun, Fluor and Cooling based upon contract.

Braun secured a judgment against Fluor based upon contract.

Fluor secured a judgment against Cooling based upon contract.

 The contract between Northern Petro and Braun provided that Braun would indemify Northern Natural and Northern Petro against any liabilities for injuries to any person "arising out of any act or omission of Contractor [Braun] or its Subcontractors in connection with, or incidental to any of the Work * * *." Braun asserts that the contract did not encompass sub-subcontractors such as Cooling. We do not agree that the contract was meant to relieve Braun of responsibility if its subcontractor Fluor should redelegate the responsibility. The term "subcontractor" reaches those who take a portion of a contract from a subcontractor. Baker & Conrad, Inc. v. Chicago Heights Constr. Co., 364 Ill. 386, 395, 4 N.E.2d 953 (1936); Hardware

Mut. Cas. Co. v. Hilderbrandt, 119 F.2d 291, 297 (10th Cir. 1941). Therefore, the judgments of Northern Natural and Northern Petro on their contractual cross-claims against Braun were proper.

 Northern Petro's and Braun's contractual indemnity cross-claims against Fluor depend upon the following clause in the Fluor-Braun contract:

"INDEMNIFICATION. Contractor [Fluor] shall indemnify and save Braun and Braun's customer [Northern Petro] free and harmless of and from any and all costs, expenses, claims, demands, suits, actions or judgments made, brought or recovered against either Braun or Braun's customer for personal injuries, death or property damage resulting in whole or in part from any act or omission of Contractor or his subcontractors or the agents, servants or employees of either, in connection with work covered by this subcontract."

Fluor argues conditionally that if it is held not entitled to indemnity from Cooling, then it should not have to indemnify Braun and Northern Petro. Since we conclude below that Cooling must idemnify Fluor, this argument is waived. In any event, it is clear that Northern Petro and Braun were entitled to idemnity under the paragraph just quoted.

 As to Northern Petro's and Fluor's third-party claims against Cooling for contractual indemnity, the pertinent clauses of the Cooling-Fluor contract provide:

"10. CONTRACTOR does indemnify and save harmless F.C.P.C. and OWNER [Northern Petro], or either, from all claims, demands, causes of action or suits of whatever nature arising out of the services, labor, equipment and materials furnished by CONTRACTOR * * *.

"11. CONTRACTOR assumes entire responsibility and liability for all losses, expenses, damages, demands and claims in connection with or arising out of any injury * * * to persons or property sustained or alleged

to have been sustained in connection with or to have arisen out of the performance of the WORK by CONTRACTOR * * * including losses, expenses or damages sustained by F.C.P.C. or OWNER, and herein indemnifies and holds harmless F.C.P.C. and OWNER * * * from any and all such losses, expenses, damages, demands and claims, and agrees to defend any suit or action brought against them, or any of them, based on any such alleged injury or damage, and pay all damages, costs and expenses, including attorney's fees, in connection therewith or resulting therefrom.

" 'Injury' or 'damage,' as these words are used in this Article 11, shall be construed to include, but not limited to, injury or damage consequent upon the failure of or use or misuse by CONTRACTOR, its subcontractors, agents, servants or employees, of any hoist, rigging, blocking, scaffolding, or any and all other kinds of items of equipment, whether or not the same be owned, furnished or loaned by OWNER or F.C.P.C."

This indemnity clause fits like a glove. It protects Fluor as a party to the contract, and Northern Petro as a specifically designated third party beneficiary. Cooling's active misconduct caused plaintiff's injuries, so that there can be no doubt that Fluor's and Northern Petro's liability arose "in connection with" or "out of the performance of the WORK by CONTRACTOR" Cooling.

Some of the indemnitors rely on the rule that "an indemnity contract will not be construed as indemnifying one against his own negligence, unless such a construction is required by clear and explicit language of the contract." Westinghouse Elec. Elevator Co. v. LaSalle Monroe Bldg. Corp., 395 Ill. 429, 433, 70 N.E.2d 604, 607 (1946); Tatar v. Maxon Constr. Co., 54 Ill.2d 64, 67, 294 N.E.2d 272 (1973). They argue that since each indemnitee in this case was held liable to plaintiff for its own statutory violation sounding in negligence, none are entitled to indemnity.

Negligence includes a broad range of culpability, and it is clear that the indemnitors here have ignored the facts of *Westinghouse* and *Tatar* and quoted the rule of those cases in a factual situation where it was never meant to apply. In both *Westinghouse* and *Tatar*, the victim was injured when an employee of the indemnitee negligently allowed a heavy object to fall on him. This active negligence was the sole cause of the injuries; there is no indication that the indemnitors were guilty of even passive negligence.

Cooling was the actively negligent party which caused this accident, and it is not an indemnitee. *Westinghouse* and *Tatar* do not apply to the more passive negligence of the defendants in not requiring Cooling to install a ladder, or in Fluor's case, not supplying a ladder in the kit of parts.

"We are not here confronted by the situation where the [indemnitor] had no control over the operation which was the basis for the conservative approach in all of the cases cited by defendant * * * .

"We are not authorized to read into the indemnity an exception in the case in which the indemnitee's failure to act also created a situation which made the incidence of the situation more probable." Fosco v. Anthony R. Delisi, Gen. Cont., Inc. 103 Ill.App.2d 457, 464, 243 N.E.2d 871, 875 (1968).

See also Spurr v. Acme Steel Co., 238 F.Supp. 606, 608–610 (N.D.Ill.1964) (collecting cases), affirmed sub nom. Spurr v. LaSalle Constr. Co., 385 F.2d 322, 330 (7th Cir. 1967).

Although Cooling argues to the contrary, the provisions for attorney's fees "in connection with" the work in the various indemnity contracts cover fees incurred defending or prosecuting indemnity claims as well as fees incurred defending against plaintiff's suit. Cf. United States Fidelity & Guar. Co. v. Virginia Eng'r Co., 213 F.2d 109 (4th Cir. 1954); Schroeder v. Pennsylvania R. R., 397 F.2d 452, 459 (7th Cir. 1968).

Accordingly, we sustain the six judgments for contractual indemnity. These judgments are duplicative of the six judgments for common law indemnity between the same pairs of parties, so that it appears unnecessary to resolve the issues tendered by the appeals from those judgments. Three other judgments for common law indemnity have been appealed: that of Northern Natural against Fluor, Northern Natural against Cooling, and Braun against Cooling. Although these judgments do not exactly duplicate other judgments, they appear to have no practical effect because all liability has been funneled down to Cooling by the chain of contractual indemnity. Accordingly, we will vacate the nine judgments for common law indemnity without considering the merits. If there is still a live controversy despite our affirmance of the other judgments in any of the disputes over common law indemnity, the parties may bring the matter to our attention on petition for rehearing. Cf. Spurr v. LaSalle Constr. Co., 385 F.2d 322, 332 (7th Cir. 1967).

All judgments for plaintiff and all judgments for contractual indemnity are affirmed; all judgments for common law indemnity are vacated; Cooling to bear all costs.